# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JOHNSON BANK,**

Plaintiff-Counter-Claim Defendant,

-vs-                                                    **Case No. 14-C-403**

**JEAN M. HASTER,**

Defendant-Counter-Claimant.

# DECISION AND ORDER

This action, arising from a home equity loan between the Plaintiff Johnson Bank and pro se Defendant Jean M. Haster, is before the Court on Johnson Bank's summary judgment motion on its breach of contract claim.[1] (ECF No. 17.) Haster has a number of counterclaims which are not addressed herein.[2] After two stays/extensions of time to respond (ECF Nos. 25, 31), the summary judgment motion is briefed and ready for resolution.

## Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1] Johnson Bank's Complaint consists of a breach of contract claim (first cause of action) and a promissory estoppel claim (second cause of action). (ECF No. 1-1.)

[2] Haster counterclaims for declaratory judgment that Johnson Bank breached the Mortgage Agreement by filing this action after filing a satisfaction of mortgage (first counterclaim), breach of contract (second counterclaim), breach of the covenant of good faith and fair dealing (third counterclaim), and equitable estoppel (fourth counterclaim). (Ans. & Countercl.) (ECF No. 5.)

judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Summary judgment should be granted when a party that has had ample time for discovery fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* If the moving party establishes the absence of a genuine issue of material fact, the non-moving party must demonstrate that there is a genuine dispute over the material facts of the case. *Id.* at 323-24. The Court must accept as true the evidence of the nonmovant and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Summary judgment is appropriate only "where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party." *See Bunn v. Khoury Enters., Inc.,* 753 F.3d 676, 681 (7th Cir. 2014) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

Johnson Bank followed the procedure outlined in Civil Local Rule 56(a) (E.D. Wis.), applicable when a party is moving for summary judgment and the opposing party proceeds pro se, and included the text of rules 56(c),(d), and (e) of the Federal Rules of Civil Procedure Civil L. R. 56(a) and (b) and Civil L. R. 7 as a part of the motion.

Haster responded to Johnson Bank's proposed findings of fact and presented further statements of material facts. (ECF No. 34.) In her response,

Haster relies on her declaration, exhibit J (ECF No. 34-1), which she had previously filed on April 16, 2015 as ECF No. 23. In reply, Johnson Bank relies on its response (ECF No. 27) to that declaration. Haster declares ". . . I have personal knowledge of the facts set forth herein, except as to those stated on information and belief, and to those, I am informed and believe them to be true." (Haster Decl., 2.)

However, Fed. R. Civ. P. 56(c)(4) states "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Luster v. Ill. Dep't. of Corr.,* 652 F.3d 726, 731 n.2 (7th Cir. 2011). Under Rule 56(c)(4), any statement of purported fact not made on personal knowledge may not be used to support or oppose summary judgment and, therefore, unless agreed to by Johnson Bank, such statement or fact by Haster has been excluded. Specifically, the Court has excluded paragraphs 12, 13, 15, 16, 17, 18, 25, 32, 35, 36, 67, 81 of the Haster declaration.

Civil L.R. 56(b)(2)(B) and (C) provide that:

[e]ach party opposing a motion for summary judgment must file . . .

a concise response to the moving party's statement of facts that must contain:

(i) a reproduction of each numbered paragraph in the moving

- 3 -

party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, *specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon,* and

(ii) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, declarations, parts of the record, and other supporting materials relied upon to support the facts described in that paragraph. A non-moving party may not file more than 100 separately-numbered statements of additional facts.

(Emphasis added.) However, in opposing the specific facts, Haster has cited "Defendant[']s Declaration attached hereto & Exhibit J—Defendant[']s Other Declaration." (*See* ECF No. 34, ¶¶ 7, 8, 18, 19, 21, 24, 25, 29.) Citation to an entire declaration is not a specific reference and does not comply with the requirements of Civil L.R. 56(b)(2)(B). Thus, such responses do not create a factual dispute.

## RELEVANT FACTS[3]

Johnson Bank, a state-chartered bank, filed this action in the Circuit Court for Waukesha County, Wisconsin. Haster removed the case to this

---

[3] The relevant facts are based on the Bank's proposed findings of fact (ECF No. 19) and Haster's further statement of material facts to the extent that they are factual and undisputed. Arguments and contentions are not facts.

Paragraphs 16 through 29 of Haster's responses to the Johnson Bank's proposed findings are misnumbered by one; for example, her paragraph 16 response is to paragraph 15 of Johnson Bank's proposed findings. The Court has considered Haster's responses as if they were properly numbered.

Citations to all quoted documents are included, even those that are undisputed.

- 4 -

Court, invoking diversity jurisdiction as provided by 28 U.S.C. § 1332.[4]

In October 2008, Haster entered into a Home Equity Total Line of Credit Agreement ("Home Equity Agreement") with Johnson Bank. (Vela Aff.[5] ¶ 5, Ex. 1.) (ECF Nos. 20, 20-1.) The transaction involved the execution of two main documents: the Home Equity Agreement and the Mortgage Agreement. Both documents were drafted by Johnson Bank.

The Home Equity Agreement provided $250,000 worth of credit to Haster.[6] As to its term, the Agreement states:

> The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until termination of your Credit Line Account. All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon termination. The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement is accepted by us . . . and the meeting of all of our other conditions and will continue as follows: One year from the date of this agreement; automatically extended from year to year after this date, unless the Lender gives [Haster] notice to the contrary at least 30 days prior to the annual anniversary date. You may obtain credit advances during this period ("Draw Period").

--------

[4] This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a) and venue is proper under 28 U.S.C. § 1391(b)(2).

[5] In referring to affidavits filed by Lydia Vela, the parties use Vela's given name; the Court has used her surname.

[6] There is a factual dispute between the parties regarding the loan to value ratio of the October 2008 Home Equity Agreement. Haster avers that at the time the Home Equity Agreement and Mortgage were executed they were for 160% of her appraised home value. (Haster Decl. ¶ 64.) Johnson Bank contends that at the time of origination the loan to value ratio was 84.345%. (Resp. Haster Decl. ¶ 64, relying on Vela's supplemental affidavit and citing "exhibit 10" at page 13 (P208)). (ECF Nos. 27, 28-1.)

- 5 -

(*Id*. "Term", 1.)[7]  The Home Equity Agreement obligated Haster to pay the "Credit Line Account . . . in full upon termination in a single balloon payment," stating that "[she] must pay the entire outstanding principal, interest and any other charges then due."  (*Id.,* "Balloon Payment," 1.)

> The Home Equity Agreement states:
>
> You promise to pay JOHNSON BANK, or order, the total of all credit advances and FINANCE CHARGES, together with all costs and expenses for which you are responsible under this agreement or under the "Mortgage" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. . . . We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

(*Id*., "Promise to Pay," 1.)

The Agreement also states: "You acknowledge this Agreement is secured by the following collateral described the security instrument listed herein: a Mortgage dated October 6, 2008, to us on real property located in Waukesha County, State of Wisconsin."  (*Id*., "Collateral," 2.) The Agreement also states: "During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights. . . . Any credit advances in excess of your Credit Limit will not be secured by the Mortgage

---

[7] The Agreement states: "Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement." *(Id*. Ex. 1, "Caption Headings," 4.)  The Court has used them solely to assist in locating quoted excerpts.

covering your principal dwelling." (*Id.*, "Credit Limit," 1.)

With respect to termination by Johnson Bank, the Agreement provides:

We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen:

(1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition.

(2) You do not meet the repayment terms of the Credit Agreement.

(3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

(*Id.*, "Termination and Acceleration," 3.) The Agreement also includes a provision stating

[i]n addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect: . . .

(3) You are in default under any material obligation of this Credit Line Account. We consider all of your obligations to be material. . . . No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(*Id.*, "Suspension or Reduction," 3.)

- 7 -

With respect to changes in the terms, the Agreement states:

> We may make changes to the terms of this Agreement if you
> agree to the change in writing at that time, if the change will
> unequivocally benefit you throughout the remainder of your
> Credit Line Account, or if the change is insignificant (such as
> changes relating to our data processing systems). . . .

(*Id.*, "Change in Terms," 3.) It also states "[y]ou agree that you will provide

us with a current financial statement, a new credit application, or both,

annually, on forms provided by us. Based upon this information we will

conduct an annual review of your Credit Line Account." (*Id.*, "Annual

Review," 4.)

Haster granted Johnson Bank a Mortgage on her residence at 2135

Underwood Parkway, Elm Grove, Wisconsin. At the time it was her primary

residence. The Mortgage secured the Home Equity Agreement and any

monies advanced under that Agreement to the property. (*Id.*, Ex. 2.) (ECF No.

20-2.) The Mortgage was recorded with the Waukesha County, Wisconsin

Register of Deeds.

The Mortgage states:

> If [Haster] pays all the indebtedness when due, terminates the
> credit line account, and otherwise performs all the obligations
> imposed upon [Haster] under this Mortgage, Lender shall
> execute and deliver to [Haster] a suitable satisfaction of this
> Mortgage and suitable statements of termination of any
> financing statement on file evidencing Lender's security
> interest in the Rents and the Personal Property. [Haster] will
> pay, if permitted by applicable law, any reasonable termination
> fee as determined by Lender from time to time.

- 8 -

(*Id.*, "Full Performance," 3-4.)

The Mortgage defines "Indebtedness" as:

. . . all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and, to the extent not prohibited by law any amounts expended or advanced by Lender to discharge [Haster's] obligations or expenses incurred by Lender to enforce [Haster's] obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross Collateralization provision of this Mortgage.

(*Id.*, "Definitions," 6.)

The Mortgage also states:

[t]his Mortgage secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to [Haster] so long as [Haster] complies with all the terms of the Credit Agreement. . . .

It is the intention of [Haster] and Lender that this Mortgage secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in the Credit Agreement and any intermediate balance.

(*Id.*, "Revolving Line of Credit," 1.) With respect to amendments, the Mortgage states: "To be effective, any change or amendment to the Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment." (*Id.,* "Amendments," 4.)

In August 2009, Haster refinanced the property with Johnson Bank. As

- 9 -

a part of the refinance, the Home Equity Agreement was to be paid down and closed. However, this did not happen.[8]

In October 2009, the Bank sent Haster a Change in Terms Agreement, primarily modifying certain fees and charges terms in the Home Equity Agreement. It states "[e]xcept as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect." (*Id*., Ex. 4, "Continued Validity," 1.) (ECF No. 20-4.)

In December 2010, Haster made a $247,832.00 draw on the Line of Credit under the Home Equity Agreement. In March 2011, Haster made a $2,068.50 draw.[9]

In March 2011, Johnson Bank executed and recorded a satisfaction of mortgage on Haster's property. (ECF No. 20-5.)

In March 2012, Haster refinanced the property with Badger Bank for about $233,000. No part of the Badger Bank refinance was paid toward the

---

[8] Johnson Bank maintains that there was an outstanding balance of $99.50 on the loan. Haster has not been consistent in her position. *Compare* Haster Resp. ¶ 13 (ECF No. 34), "Defendant is without sufficient information to admit or deny; however, to the extent a $99.50 balance existed it was likely an annual fee assessed by Johnson Bank" to Haster Declaration, ¶ 6, "the . . . Mortgage Loan, which I had never utilized, and which had, or should have had, an outstanding balance of ZERO." However, construed in the light most favorable to Haster, there is a factual dispute regarding whether any funds were due and owing.

[9] Johnson Bank maintains that the total amount drawn under the Home Equity Agreement is $250,000. Haster has not been consistent in her position. (*Compare* Haster Resp. ¶ 17 "Defendant admits this statement." to Haster Declaration, ¶ 14, "on March 10, 2011, the subject HELOC Mortgage Loan had an outstanding balance, in good standing, in the amount of $249,900.50.")

amount due under the Johnson Bank Home Equity Agreement.

In July 2013, Johnson Bank sent Haster a letter and forms for her to complete requesting information in order to conduct an annual review of the Home Equity Agreement. The letter states:

> We do understand that your situation may have changed and you choose to not renew the line of credit at this time. If you decide to close the line or we are unable to renew the line, you will be required to pay the outstanding balance and interest due by the scheduled maturity date of the HELOC 10/06/2013. There is no prepayment penalty for paying off and closing the line of credit.
>
> Please note that if you are past due on payments, delinquent or in default under the terms of the HELOC Agreement or you no longer qualify for the line of credit, we may determine that we are unable to renew your line of credit.

(Vela Aff., Ex. 6.) (ECF No. 20-6.) This was the first time Johnson Bank provided financial forms for Haster to complete and submit for an annual review.

Between July and mid-October 2013, numerous conversations took place between Haster and Johnson Bank concerning the Home Equity Loan. Records regarding the various loans were scattered between Haster's residence in Florida and her "home" in Wisconsin; as a result she did not have full access to all the facts during the ongoing communications.

In August 2013, Johnson Bank completed an annual review of the Home Equity Agreement and informed Haster that it was unable to renew the

- 11 -

terms of the Home Equity Agreement due to insufficient collateral. Johnson Bank indicated that the Home Equity Agreement would be terminated and the entire balance due if Haster did not agree to convert it to a Home Equity Term Loan. Haster did not agree (Vela Aff. ¶ 23) and, as a result, Johnson Bank terminated the Home Equity Agreement and accelerated all amounts due and owing.

An October 2013, email from Johnson Bank Senior Mortgage Loan Officer Jeff Cummisford states in relevant part;

> In summary, [w]hen you refinanced with Johnson Bank on August 9, 2009, your Johnson Bank HELOC [Home Equity Line of Credit] should have been "closed out." This means that this account should have been closed out and you would no longer be able to withdraw any funds. With a permanent [f]ixed loan amount loan amount of $240,000 and a value of some $300,000, you no longer would have enough "equity" to continue a HELOC.
>
> This HELOC was not closed out and you withdrew additional funds ($250,000) for some purchases.
>
> As a result, we have a second mortgage on your Elm Grove home that does not have sufficient collateral.
>
> We would like for you to either pay off the second mortgage loan HELOC in full or place a mortgage loan on other real estate property that you own to have sufficient equity/collateral.

(Haster Ans. and Countercl., Ex. G.) (ECF No. 5-7.)

By October 2013, Haster had consolidated her records, and she mailed a certified letter to Cummisford stating her position that the HELOC account was extinguished as of March 23, 2011, when the satisfaction of mortgage

- 12 -

was recorded.  The final paragraph of her one-page letter states:

> I do not expect to hear from you again regarding this matter and will consider it fully resolved following <u>30 days</u> from the date of this letter. However, should you need to contact me further within the timeframe allotted, please do so by email or mail to my address(s) of record.

(Haster Decl. ¶ 78, citing Ans. and Countercl., Ex. C, ECF No. 5-4.) Cummisford did not contact Haster within 30 days.[10]

Prior to November 2013, Haster had been making interest only payments under the Home Equity Agreement; she has not made any payments toward the line of credit under the Home Equity Agreement since November 12, 2013.

After Haster's October letter, the next communication she received from Johnson Bank was a letter from Katie Ramiriz informing her that Johnson Bank had not received a payment for November 2013.  No mention or acknowledgment of Haster's letter to Cummisford was included with the communication.

In December 2013, Haster sent Ramiriz a letter advising her that the HELOC in question was extinguished, that Cummisford had personally been handling the account, and that the matter had since resolved itself.

---

[10] In response to ¶ 79 of Haster's declaration, Johnson Bank states that it retained Attorney English regarding the matter, citing "English Aff. p. 2 of pdf." However, review of the English affidavit (ECF No. 29) and its attachments does not disclose what Johnson Bank is referring to or provide support for the factual proposition.

- 13 -

Johnson Bank sent Haster a right to cure letter dated January 23, 2014, indicating that Haster had until February 7, 2014, to cure her default.

On February 26, 2014, after Johnson Bank filed this action against her, Haster received a "Notice of Right to Cure Default Letter," stating "You may cure the default(s) on or before March 13, 2014." (Haster Decl. ¶ 85, citing Ans. and Countercl., Ex. I, ECF No. 5-9.)

At no time has Johnson Bank offered to rescind its termination and demand for a balloon payment.

## ANALYSIS

Johnson Bank seeks summary judgment (1) declaring that Haster breached their contract by failing to make required payments under the Home Equity Agreement and is in default under that Agreement and (2) finding that as of March 11, 2015, Johnson Bank is entitled to judgment against Haster in the amount of $279,552.55 together with interest, costs, disbursements, and actual attorney fees. Johnson Bank also maintains that even if Haster is deemed to have cancelled the loan, she would still be liable based on the provision in the Home Equity Agreement that states: "[d]espite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all the amounts due under this Agreement." (Vela Aff., Ex. 1, "Cancellation by You," 4.) Johnson Bank makes no argument with respect to its promissory estoppel claim.

- 14 -

Liberally construed, Haster opposes summary judgment, contending that Johnson Bank breached the Home Equity Agreement, that the Agreement is ambiguous, and that Johnson Bank has breached the duty to act in good faith which is inherent in any contract. She also relies upon the defenses that the mortgage was extinguished, excused performance based on Johnson Bank's breach of contract, unclean hands, and equitable estoppel. She contends that Johnson Bank released her from any obligation under the Home Equity Agreement in August 2009 by transferring the loan to Freddie Mac, that paperwork from the loan shows no mortgage lien, and that Johnson Bank recorded the Satisfaction of Mortgage for the property.[11] (ECF Nos. 33, 34-2, 34-7.)

Under the *Erie* doctrine, a federal court exercising diversity jurisdiction must follow the law of the state in which the action is brought. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Therefore, this Court applies Wisconsin choice of law principles to determine which state's substantive law applies. *See Sybron Transition Corp. v. Sec. Ins. Co.,* 107 F.3d 1250, 1255 (7th Cir. 1997). Here, the parties are in apparent agreement that Wisconsin substantive law applies, and this Court concurs.[12] Although

---

[11] Haster also asserts that Johnson Bank cannot establish she was unjustly enriched and this action is controlled by contract.

[12] In contract cases, Wisconsin choice of law principles point toward the law of

not cited by either party, the Home Equity Agreement also provides that it is governed by federal law and, to the extent not preempted by federal law, by the laws of the state of Wisconsin without regard to its conflict of law provisions. (Vela Aff., Ex. 1, "Governing Law," 4.)

Contract interpretation presents a question of law. *Estate of Kriefall v. Sizzler USA Franchise, Inc.,* 342 Wis. 2d 29, 47-48, 816 N.W.2d 853, 862 (Wis. 2012). Wisconsin courts construe contracts to determine and give effect to the intentions of the parties. *Id.* Parties are presumed to express their intentions in the language of the contract. *Id.* "Where the language of a contract is unambiguous and the parties' intentions can be ascertained from the face of the contract, [the courts] give effect to the language they employed." *Id.* If the terms of a contract are unambiguous, a court is barred from considering any extrinsic evidence such as prior or contemporaneous understanding or agreements between the parties. *Tufail v. Midwest Hosp., LLC,* 348 Wis. 2d 631, 644, 833 N.W.2d 586, 593 (Wis. 2013). Unambiguous contract language

---

the state with which the contract has the most significant relationship, also known as the "grouping-of-contacts" rule. *State Farm Mut. Auto. Ins. Co. v. Gillette,* 251 Wis. 2d 561, 577, 641 N.W.2d 662, 670 (Wis. 2002). The law of the forum is presumed to apply unless it is clear that the non-forum contacts are of "greater significance." *Drinkwater v. Am. Family Mut. Ins. Co.,* 290 Wis. 2d 642, 658, 714 N.W.2d 568, 576 (Wis. 2006). The relevant contacts include: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domiciles, places of incorporation and places of business of the parties. *In re Jafari,* 569 F.3d 644, 650 (7th Cir. 2009). Those factors establish a significant relationship with Wisconsin in this case; that is, the parties entered into the agreements in Wisconsin, the agreements were to be performed in Wisconsin, Johnson Bank is a Wisconsin entity and Haster was domiciled in Wisconsin at the time of the agreements.

- 16 -

is given its plain and ordinary meaning, as it is written.  *Id.* at 592.  A contract is ambiguous if the language contained therein, when given its plain and ordinary meaning, is susceptible to more than one reasonable interpretation.  *Town Bank v. City Real Estate Dev., LLC,* 330 Wis. 2d 340, 356, 793 N.W.2d 476, 484 (Wis. 2010*). See also Seitzinger v. Comm. Health Network,* 270 Wis. 2d 1, 15, 676 N.W.2d 426, 433 (Wis. 2004) (noting that language in a contract should be "interpreted consistent with what a reasonable person would understand the words to mean under the circumstances").

A material breach by one party may excuse subsequent performance by the other.  *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 183, 557 N.W.2d 67, 77 (Wis. 1996).  However, a party is not automatically excused from future performance of contract obligations every time the other party breaches.  *Id*.  "If the breach is relatively minor and not 'of the essence', the [party] is himself still bound by the contract; he can not [sic] abandon performance and get damages for a 'total' breach by the [other party]."  *Id*.  (Citations omitted.)  In other words, "there must be so serious a breach of the contract by the other party as to destroy the essential objects of the contract."  *Id*. at 77-78. (Citation omitted.)

Haster's brief cites Wisconsin cases regarding contract ambiguity, although it does not identify any specific contract provision as being

- 17 -

ambiguous. However, paragraphs 21 and 22 of Haster's declaration contend that the mortgage's "full performance" clause makes full performance the only unambiguously agreed upon event that permits the filing of a satisfaction of mortgage and, in the alternative, that the clause is ambiguous with respect to Johnson Bank's filing the satisfaction of mortgage without Haster's written permission and in the absence of payment to the lender's full satisfaction of all indebtedness due under the mortgage and subsequent discharge.

In relevant part, the mortgage "full performance" clause states:

> If [Haster] pays all the indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon [Haster] under this Mortgage, Lender shall execute and deliver to [Haster] a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the personal property.

(Vela Aff., Ex. 2, "Full Performance," 3-4.) As pertinent to this case, the clause imposes an obligation upon the lender to file a satisfaction of mortgage when the borrower repays of all of the monies borrowed from the lender and terminates the credit line account. The clause is clear and unambiguous. *Estate of Kriefall,* 816 N.W.2d at 862. It is not susceptible to more than one reasonable interpretation. *Town Bank,* 793 N.W.2d at 484. The clause is intended to obligate the lender to file a mortgage satisfaction upon the borrower's fulfillment of his or her contractual obligations under the mortgage. However, it does not contain any language restricting a lender to

- 18 -

filing a satisfaction of mortgage only in that situation. Thus, Haster has not established that Johnson Bank committed a material breach by filing the satisfaction of mortgage. She has also not established that the full performance clause is ambiguous.

In paragraph 26 of her declaration, Haster contends that the Home Equity Agreement contains a mandatory collateral provision demonstrating the parties' intention that the lien last as long as debt. She relies upon the following statement "You acknowledge this Agreement is secured by the following collateral described the security instrument listed herein: a Mortgage dated October 6, 2008, to us on real property located in Waukesha County, State of Wisconsin." (Vela Aff., Ex. 1, "Collateral," 2.) This provision simply means that Haster recognizes the mortgage on her home secures the line of credit. No mandatory words such as "shall" or "must" appear in the provision. *Riley v. Extendicare Health Facilities, Inc.,* 345 Wis. 2d 804, 825, 826 N.W. 2d 398, 409 (Wis. Ct. App. 2012) (regarding "shall").

The Home Equity Agreement also states "[y]ou agree that you will provide us with a current financial statement, a new credit application, or both, annually on forms provided by us. Based upon this information, we will conduct an annual review of your Credit Line Account." (Vela Aff., Ex. 1, "Annual Review," 4.) The foregoing provision entitles Johnson Bank to make annual requests for Haster's current financial statement and/or a new credit

- 19 -

application and to annually review Haster's credit line account. Contrary to Haster's contention, the provision, lacking mandatory language, does not *require* Johnson Bank to conduct annual reviews of her credit line account. *See Riley,* 826 N.W. 2d at 409.

Haster asserts that Johnson Bank breached its duty of good faith, citing its answers to interrogatories numbers seven and nine and stating that her contentions are set forth in her declaration. The Wisconsin Supreme Court has held that "every contract implies good faith and fair dealing between the parties to it. . . ." *Runzheimer Int'l, Ltd. v. Friedlen,* 362 Wis. 2d 100, 126, 862 N.W.2d 879, 891 (Wis. 2015) (Citations omitted). Wisconsin disfavors "following the letter but not the spirit of an agreement, and . . . it [is] deemed a violation of the covenant of good faith and fair dealing to do so." *Id.* at 891-92 (Citation omitted). As an example*, Runzhemier* states "[w]hen an employer promises not to fire an existing at-will employee if the employee agrees to sign a restrictive covenant, the employer violates the spirit of the agreement when the employer fires the employee moments after the employee signs the covenant." *Id*. at 892.

Johnson Bank responded "by failing to make the required payments since November 2013 and refusing to cooperate in the conversion of the HELOC to a different type of loan product" to Haster's interrogatory seven, which requests the bank's factual and legal basis for contending that Haster

- 20 -

breached the contract. (Haster Resp., Ex. Q, 4.) (ECF No. 34-8.) Johnson Bank's answer to interrogatory number nine regarding its factual and legal basis for asserting it acted in good faith and fairly dealt with Haster during their contractual relationship, states in relevant part "upon learning the collateral was insufficient to support the HELOC, Johnson Bank reached out to Defendant in order to transition her to a different loan product better suited for the circumstances." (*Id.* at 5.) Haster's basis for relying upon the two foregoing responses as evidence of Johnson Bank's breach of the implied duty of good faith and fair dealing is neither stated nor apparent.

Equitable estoppel is a bar to the assertion of what would otherwise be a right; it does not of itself create a right. *Murray v. City of Milwaukee*, 252 Wis. 2d 613, 625, 642 N.W.2d 541, 547 (Wis. Ct. App. 2002) (citing *Utschig v. McClone*, 16 Wis. 2d 506, 509, 114 N.W.2d 854 (Wis. 1962)). The requirements of equitable estoppel are: (1) action or inaction, (2) on the part of one against whom estoppel is asserted, (3) which induces reasonable reliance thereon by the other, either in action or non-action, and (4) which is to his or her detriment. *Id.* at 547 n.9 (citing *Milas v. Labor Ass'n of Wis., Inc.,* 214 Wis. 2d 1, 11-12, 571 N.W.2d 656 (Wis. 1997)). In this regard, Haster relies upon Johnson Bank's failure to respond to her October letter. However, given the multiple prior contacts between the parties during which Johnson Bank maintained that Haster was obligated to repay the amounts

due under the Home Equity Agreement, no reasonable jury would find that Haster's reliance on Johnson Bank's failure to respond to her letter was reasonable.

A plaintiff who seeks affirmative equitable relief must have "clean hands" before the court will entertain the plea. *S & M Rotogravure Serv., Inc. v. Baer,* 77 Wis. 2d 454, 466, 252 N.W.2d 913, 918-19 (Wis. 1977). Johnson Bank's breach of contract claim is an action at law for damages, *see Bischoff v. Hustisford State Bank,* 195 Wis. 312, 218 N.W. 353, 355 (Wis. 1928). Since Johnson Bank's summary judgment motion does not involve a request for affirmative equitable relief, the clean hands doctrine is not applicable.

Haster also contends that Johnson Bank's filing of the mortgage satisfaction extinguished her obligations under the Home Equity Agreement. However, a mortgage and a promissory note are two separate and distinct legal documents. *Thorpe v. Mindeman*, 123 Wis. 149, 101 N.W. 417, 419 (Wis. 1904). While the documents may be construed together for purposes of interpretation, a mortgage and a promissory note form two separate contracts. *Id*. at 420. Further, "[t]he holder of the note may discard the mortgage entirely, and sue and recover on his note. . . ." *Id*. A promissory note compels one party to loan money to another party, normally upon set repayment terms, with an applicable interest rate. *See Id*. at 419. A mortgage, on the

- 22 -

other hand, generally grants the individual or entity making the loan an interest in real property owned by the borrower. *See Id.* Not all promissory notes require a mortgage. A promissory note can survive without a mortgage, and even after satisfaction of the mortgage. In other words, the discharge of a mortgage does not necessarily establish payment and release of the underlying indebtedness. *See Latton v. McCarty,* 142 Wis. 190, 125 N.W. 430, 432 (Wis. 1910); *Kellogg Bros. Lumber Co. v. Mularkey,* 214 Wis. 537, 252 N.W. 596, 597 (Wis. 1934).

In this case, nothing in the Satisfaction of Mortgage states that Haster is released from any liability or obligations under the Home Equity Agreement. The only reference to the Home Equity Agreement in the Satisfaction of Mortgage is the dollar amount secured by the Mortgage. Therefore, the Satisfaction of Mortgage has no effect on Haster's liabilities and obligations under the Home Equity Agreement.

Even accepting Haster's position that the Satisfaction of Mortgage cancelled the Home Equity Agreement, the amount she borrowed with interest is still due and owing. Construing the facts in the light most favorable to Haster, she admits she drew $249,900.50 under the Home Equity Agreement. A defendant must affirmatively allege making the required payments under a note and mortgage to raise an issue when a plaintiff alleges non-payment. *Virkshus v. Virkshus,* 250 Wis. 90, 95, 26 N.W. 2d 156, 158-59

- 23 -

(Wis. 1947). Here, it is undisputed that Haster has not made any payments on the Home Equity Agreement since November 2013, making her in default under the terms of the Agreement. Having given her notice of the default, Johnson Bank is entitled to recover the outstanding principle and interest due under the Agreement.

Moreover, neither Haster's evidence nor her arguments excuse non-payment. The July 2009 refinance papers state that Johnson Bank will continue to service her mortgage – i.e., collect payments and handle other matters. This is supported by Johnson Bank documents post-dating July 2009, including two signed by Haster – the Change in Terms Agreement (Vela Aff., Ex. 4) and the Automatic Payment Option Authorization (Haster Resp., Ex. O) (ECF No. 34-6). Haster has not presented any evidence indicating that she made payments on the Home Equity Agreement which might otherwise release the mortgage.

Viewing the facts in the light most favorable to Haster, she borrowed nearly a quarter of a million dollars from Johnson Bank. Having conducted an annual review of Haster's loan, Johnson Bank gave notice to Haster and terminated the Home Equity Agreement due to insufficient collateral. It also gave Haster the option of converting the Home Equity Agreement into a Home Equity Term Loan — Haster declined. Although Haster disputes Johnson Bank's conclusion that the collateral was insufficient, contending that at the

- 24 -

time the Home Equity Agreement and Mortgage were signed the loan to equity value was 160% percent of the appraised value of her home, it is undisputed that Haster has made no payments on the line of credit since November 2013. As a result, Johnson Bank sent her a Notice of Right to Cure letter. Haster failed to make the necessary payments to cure her default. And, Johnson Bank responded by initiating this action. Johnson Bank is entitled to judgment finding that Haster breached their contract because Haster has not made the required payments and is in default under the Home Equity Agreement. Failure to meet the repayment terms entitled Johnson Bank to terminate the Agreement and require the entire outstanding balance due in one payment. (*See* Vela Aff., Ex. 1, "Termination and Acceleration," 3.)

Despite Haster's legal and factual arguments, she has not presented any evidence to justify non-payment, nor has she overcome Johnson Bank's showing that it is entitled to summary judgment finding that, as a matter of law, she breached the terms of the Home Equity Agreement and is  liable for the damages Johnson Bank sustained as a result of that breach.

However, given the factual dispute between the parties regarding the amount Haster drew from the Home Equity Line of Credit, further proceedings will be required to ascertain the amount of Johnson Bank's damages. Haster's counterclaims also remain pending.

This matter is currently scheduled for a May 2, 2016, jury trial.

- 25 -

However, the Court will not be available on that date. Therefore, the May 2, 2016, trial date is cancelled, and the April 18, 2016, final pretrial conference is converted to a scheduling conference to set new final pretrial conference and trial dates.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

Johnson Bank's motion for summary judgment (ECF No. 17) on its breach of contract claim is **GRANTED** as to breach and liability for damages; and **DENIED** with respect to the amount of its damages; and

The May 2, 2016, trial date is cancelled, and the April 18, 2016, final pretrial conference is converted to a telephone scheduling conference to set new final pretrial conference and trial dates. The Court will initiate the call.

Dated at Milwaukee, Wisconsin, this 23rd day of February, 2016.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 26 -